531 F.Supp. 320 (1981)
PLANNED PARENTHOOD ASSOCIATIONCHICAGO AREA, an Illinois non-profit corporation, Plaintiff,
v.
William L. KEMPINERS, individually and as Director of the Illinois Department of Public Health, Defendant,
and
Care Center of Springfield, Inc., Intervenor-Defendant.
No. 81 C 3332.
United States District Court, N. D. Illinois, E. D.
November 23, 1981.
On Motion to Stay Injunction December 7, 1981.
*321 Terry Rose Saunders, Craig R. Spiegel, Jenner & Block, Chicago, Ill., for plaintiff.
Judith Mostovoy, Asst. Atty. Gen., Tyrone C. Fahner, Atty. Gen., Imelda Terrazino, Asst. Atty. Gen., Chicago, Ill., for defendant.
Thomas J. Marzen, Americans United for Life Legal Defense Fund, Patrick A. Trueman, Dennis J. Horan, Chicago, Ill., for Care Center of Springfield, Inc.

MEMORANDUM OPINION
MARSHALL, District Judge.
This case presents the question whether the State of Illinois may constitutionally deny plaintiff, Planned Parenthood Association, eligibility for grants of state funds under a state program designed to deal with problem pregnancies, solely on the ground that Planned Parenthood offers its clients abortion counseling and referral services.

I
Planned Parenthood AssociationChicago Area (hereinafter "Planned Parenthood") is a private Illinois nonprofit corporation. Planned Parenthood is divided into *322 three departments. The Information and Education Department provides community education concerning reproductive health. The Client Service Department provides a variety of medical and counseling services. The Support Services Department provides necessary support staff and assistance. It is the activities of the Client Services Department that concern us in this lawsuit.
The Client Services Department provides, inter alia, a Pregnancy Testing and Counseling Service and a Pregnancy Information Hotline. The Testing Service conducts pregnancy testing for approximately 140 to 180 women each month. For those women who are pregnant, the Counseling service provides "options counseling."
The purpose of such counseling is to discuss all of the alternatives available to a pregnant woman, including the alternative of abortion, so that the client can have a factual basis on which to decide what course of action is best for her. Therapy is not engaged in, nor is a course of action recommended. The majority of women who come to the pregnancy testing service request and receive information concerning abortion. The counselor will provide information concerning the possibility of abortion, but the woman is never encouraged to follow that or any other particular alternative. If the client desires to be placed in touch with an abortion clinic, however, the counselor will provide the names of clinics which have been evaluated by Planned Parenthood. Clinics are evaluated on numerous bases, and the clinics mentioned are considered sufficient in all areas. A number of women who are referred to abortion clinics desire to obtain an abortion for therapeutic reasons. Planned Parenthood does not perform abortions nor does it encourage abortions. Affidavit of Elizabeth Mooney at 2-3.
Planned Parenthood also provides services to women with "problem pregnancies." This term refers to pregnancies which create mental or physical difficulties for the pregnant woman. These women are provided with counseling services which attempt to help them address their unique needs.
Defendants do not dispute Planned Parenthood's contention that it in no way promotes, encourages, or advocates abortion. All parties agree that Planned Parenthood's practices constitute a sincere attempt to neutrally and objectively inform a pregnant woman of her options, in order to ensure that her decision regarding her pregnancy is a fully informed one.
On November 1, 1979, the Illinois Problem Pregnancy Health Services and Care Act became effective. It was passed over Governor Thompson's veto.[1] The Act was designed to provide grants to grantees in order to ameliorate the plight of women with problem pregnancies. See Ill.Rev. Stat., ch. 111½, § 4604-102(A) (1979). However, the Act was amended during the course of its consideration to exclude from eligibility for grants applicants who "refer or counsel for abortion." Id. § 4604-100.
On March 31, 1981, Planned Parenthood applied for a grant under the Act. Planned Parenthood's application stated that it would use the funds for testing, options counseling, medical screening, referral, and follow-up services. The application stated that the options counseling services would involve discussion of "all options" with the client, including abortion.[2] Planned Parenthood's application was denied on the stated ground that those organizations *323 which had already been funded in the preceding year had priority for future funding.
On June 12, 1981, Planned Parenthood filed suit seeking declaratory and injunctive relief against Ill.Rev.Stat., ch. 111½, § 4604-100 (1979). William L. Kempiners, individually and as Director of the Illinois Department of Public Health, was named as defendant. Mr. Kempiners is the state official responsible for administering the Act.
On June 17, Planned Parenthood moved this court to enter a preliminary injunction against defendant Kempiners. On June 30 this court denied the motion and stated that it would instead treat the pending motion as a motion for summary judgment.
On July 31, 1981, Care Center of Springfield, Inc. moved to intervene as a defendant. Care Center is a private nonprofit corporation which provides pregnancy counseling and referral services of the type supported by the Act. Care Center currently receives 13 percent of its funding from the State of Illinois under the Act. The Center provides no abortion-related services of any kind. The motion to intervene was subsequently granted.
Planned Parenthood and Mr. Kempiners have presented cross motions for summary judgment which are fully briefed and ready for ruling. All parties agree that there is no genuine issue of material fact present in this case. Therefore, it is appropriate that the case be resolved at this juncture. See Fed.R.Civ.P. 56(c).

II
Before reaching the merits, the question of plaintiff's standing must be addressed. Although not raised by the parties, the issue must nevertheless be resolved since the constitutional requirements for standing go to this court's jurisdiction and therefore must be raised by the court on its own motion. See Fed.R.Civ.P. 12(h)(3); Orr v. Orr, 440 U.S. 268, 271, 99 S.Ct. 1102, 1107, 59 L.Ed.2d 306 (1979); Simon v. Eastern Kentucky Welfare Rights Organization, 426 U.S. 26, 38, 96 S.Ct. 1917, 1924, 48 L.Ed.2d 450 (1976); Jenkins v. McKeithen, 395 U.S. 411, 421, 89 S.Ct. 1843, 1848, 23 L.Ed.2d 404 (1969); Frothingham v. Mellon, 262 U.S. 447, 480, 43 S.Ct. 597, 598, 67 L.Ed. 1078 (1923). See also Neirbo Co. v. Bethlehem Shipbuilding Corp., 308 U.S. 165, 167, 60 S.Ct. 153, 154, 84 L.Ed. 167 (1939) (parties may not confer jurisdiction by consent).
In order to establish standing, Planned Parenthood must demonstrate that it has suffered injury in fact, and that its injury is fairly traceable to the challenged conduct. Duke Power Co. v. Carolina Environmental Study Group, 438 U.S. 59, 72, 98 S.Ct. 2620, 2629, 57 L.Ed.2d 595 (1978); Village of Arlington Heights v. Metropolitan Housing Development Corp., 429 U.S. 252, 261, 97 S.Ct. 555, 561, 50 L.Ed.2d 450 (1977). There is no doubt that Planned Parenthood has suffered injury in fact through the denial of its application. However, it is questionable whether the injury is fairly traceable to the challenged statute. Defendant Kempiners argues that the denial was simply the result of the priority accorded to previously funded agencies, and not to the abortion counseling conducted by Planned Parenthood. Moreover, because of the inseverability clause in the Act, see Ill.Rev. Stat., ch. 111½, § 4606-100 (1979), if this court holds the Act unconstitutional, state law may require that the entire grant program cease to operate. In either case, the likelihood that a judgment for the plaintiff in this case will lead to Planned Parenthood receiving government funds is speculative at best. It can therefore be argued that Planned Parenthood lacks standing because the relief it seeks will not redress the injury it has suffered. See Simon v. Eastern Kentucky Welfare Rights Organization, 426 U.S. 26, 38, 96 S.Ct. 1917, 1924, 48 L.Ed.2d 450 (1976); Warth v. Seldin, 422 U.S. 490, 505, 95 S.Ct. 2197, 2208, 45 L.Ed.2d 343 (1975).
Such an argument, however, would misconceive the nature of the constitutional injury Planned Parenthood claims to have suffered. The injury is not the fact that Planned Parenthood has been denied government funds, since it has no right to receive any money at all from the government. *324 See, e.g., Maher v. Roe, 432 U.S. 464, 469, 97 S.Ct. 2376, 2380, 53 L.Ed.2d 484 (1977). Rather, the constitutional injury stems from the fact that Planned Parenthood alleges that it has been disqualified for government funds for an impermissible reason. The Constitution is not offended by the mere refusal to subsidize, but it is offended when that refusal is made for impermissible reasons. See id. at 469-70, 97 S.Ct. at 2380; Memorial Hospital v. Maricopa County, 415 U.S. 250, 258-60, 94 S.Ct. 1076, 1082-1083, 39 L.Ed.2d 306 (1974); Shapiro v. Thompson, 394 U.S. 618, 634, 89 S.Ct. 1322, 1331, 22 L.Ed.2d 600 (1969). From a constitutional standpoint, it makes no difference whether Planned Parenthood ultimately receives state funds. What is constitutionally significant is that Planned Parenthood not be denied funds on an impermissible basis. Defendants do not dispute the assertion that Planned Parenthood is disqualified from state funding by § 4604-100. Therefore, if that statute constitutes an impermissible basis for state action, its very existence, without more, constitutes constitutional injury to Planned Parenthood. Planned Parenthood's constitutional interest is not in receiving state funds, but in having that impermissible basis removed. The relief Planned Parenthood seeks clearly will vindicate this interest. Therefore, Planned Parenthood satisfies the constitutional requirements for standing.[3]

III
In Count I of the complaint, plaintiff asserts that the statutory disqualification of grant applicants that provide abortion counseling and referral services constitutes an unconstitutional penalty on the exercise of protected rights. Planned Parenthood is denied access to a "forum" for the exercise of rights solely because of its constitutionally protected activity. This, it is said, operates as a penalty on that activity.
It is undeniably true that § 4604-100 is an attempt by the State of Illinois to adopt a "non-neutral" policy vis-a-vis abortions. As both defendants concede, Illinois has adopted a public policy which prefers childbirth over abortion. § 4604-100 is a public funding choice which implements that policy. However, the mere fact that Illinois chooses to subsidize childbirth-related services and not abortion-related services does not constitute a constitutional violation. Illinois is constitutionally free to express a preference for childbirth over abortion, and to allocate its funds so as to encourage the former over the latter. Harris v. McRae, 448 U.S. 297, 314, 100 S.Ct. 2671, 2686, 65 L.Ed.2d 784 (1980); Maher v. Roe, 432 U.S. 464, 474, 97 S.Ct. 2376, 2382, 53 L.Ed.2d 484 (1977). See also Poelker v. Doe, 432 U.S. 519, 97 S.Ct. 2391, 53 L.Ed.2d 528 (1977) (per curiam) (following Maher). While it is true that the woman's right to abort is constitutionally protected, the right to obtain funds from the government in order to exercise that right is not. McRae, 448 U.S. at 317-18, 100 S.Ct. at 2688; Maher, 432 U.S. at 476-77, 97 S.Ct. at 2383-2384. Illinois has not attempted to penalize *325 the protected right to abort; it has merely adopted a "hands-off" posture, refusing to subsidize that right.[4]
Planned Parenthood's application for funds under the Act indicates that it would have used the funds for a program which includes abortion-related services. Therefore, it is Planned Parenthood which seeks to interfere with the right of Illinois to decline to encourage abortions, rather than the converse. Planned Parenthood seeks to compel Illinois to adopt a position of neutrality; subsidizing childbirth and abortion-related counseling and referral services on an equal basis. However, as McRae and Maher clearly indicate, there is no requirement that the state be neutral vis-a-vis abortion. It is free to express its preference for childbirth, by subsidizing it and not abortion.
This would be a much different case if Planned Parenthood had demonstrated that none of the state funds it had hoped to receive would have been used for abortion-related services. In that case, the State's activity could not be characterized as a passive refusal to subsidize, for the state would not have been asked to subsidize any abortion services. In such case, § 4604-100 would indeed operate as a penalty on constitutional rights, by disqualifying Planned Parenthood for public benefits because of its privately funded activity. When a state goes further than merely refusing to subsidize abortion related services, and deprives those exercising their constitutional rights of additional funds, an unconstitutional penalty is imposed. See McRae, 448 U.S. at 317 n.19, 100 S.Ct. at 2688; Maher, 432 U.S. at 474 n.8, 97 S.Ct. at 2382. However, in this case Planned Parenthood did in fact ask the state to subsidize abortion-related services. The state's refusal of that request does not constitute a penalty on the exercise of constitutional rights.[5]

IV
In Count III of the complaint, Planned Parenthood asserts that § 4604-100's disqualification of organizations which provide abortion counseling and referral services creates a classification which denies it equal protection of the laws. What has been said above largely answers this claim. The State of Illinois has a legitimate and substantial interest in protecting potential life. McRae, 448 U.S. at 325, 100 S.Ct. at 2692; Maher, 432 U.S. at 478-79, 97 S.Ct. at 2385; Roe v. Wade, 410 U.S. 113, 162, 93 S.Ct. 705, 731, 35 L.Ed.2d 147 (1973). The state is free to make public funding choices which pursue this interest, and express a preference for childbirth over abortion, so long as this preference is expressed as a mere refusal to subsidize, and not as direct interference with the abortion decision. 448 U.S. at 316-17, 326, 100 S.Ct. at 2687-2688, 2693; 432 U.S. at 473-74, 97 S.Ct. at 2382. § 4604-100 undeniably expresses this constitutionally permissible preference, and thereby is rationally related to the state interest in protecting potential life. This is sufficient to satisfy the equal protection clause.

*326 V
In Count II of the complaint, Planned Parenthood asserts a very different type of claim from those discussed above. In this Count, Planned Parenthood asserts no right to public funding of its activities, nor does it assert that any impermissible penalty on its abortion counseling and referral activities is created by § 4604-100. Rather, it asserts that the funding scheme created by the Act directly interferes with the rights of its clients, through an active effort to interfere with their decisions whether to have an abortion. By funding only programs which provide no abortion counseling and referral, the State is alleged to provide women with "incomplete and misleading information concerning their options. Therefore, the Act directly interferes with the rights of women, who will reasonably rely on this distorted information, to make an informed decision as to whether to carry a pregnancy to term." Complaint ¶ 22.
In short, Planned Parenthood alleges that the Act is more than a mere refusal to subsidize. Instead, it is a direct attempt to obstruct the path of women seeking to exercise their constitutional rights.
"The Constitution imposes no obligation on the States to pay the pregnancy-related medical expenses of [] women.... But when a State decides to alleviate some of the hardships of poverty by providing medical care, the manner in which it dispenses benefits is subject to constitutional limitations." Maher, 432 U.S. at 469-70, 97 S.Ct. at 2380 (footnote omitted). As the Maher Court recognized, the manner in which government largess is distributed is subject to constitutional scrutiny. Refusals to subsidize, if based on constitutionally impermissible criteria, may be invalidated even if they leave persons no less able to exercise rights than if government subsidized no activities at all. See Thomas v. Review Board of the Indiana Employment Security Division, 450 U.S. 707, 101 S.Ct. 1425, 1431-32, 67 L.Ed.2d 624 (1981); Memorial Hospital v. Maricopa County, 415 U.S. 250, 258-60, 94 S.Ct. 1076, 1082-1083, 39 L.Ed.2d 306 (1974); Shapiro v. Thompson, 394 U.S. 618, 634, 89 S.Ct. 1322, 1331, 22 L.Ed.2d 600 (1969); Sherbert v. Verner, 374 U.S. 398, 403-06, 83 S.Ct. 1790, 1793-1795, 10 L.Ed.2d 965 (1963);[6]The Supreme Court, 1979 Term, 94 Harv.L.Rev. 75, 99-100 (1980). While government is under no obligation to provide any form of state-provided benefit, once it does so, it is not free to withhold benefits on a forbidden basis.
For at least a quarter-century, this Court has made clear that even though a person has no "right" to a valuable governmental benefit and even though the government may deny him the benefit for any number of reasons, there are some reasons on which the government may not rely. It may not deny a benefit to a person on a basis that infringes his constitutionally protected interests.... Perry v. Sindermann, 408 U.S. 593, 597, 92 S.Ct. 2694, 2697, 33 L.Ed.2d 570 (1972).
Thus, government may not deny benefits to persons because they have exercised protected rights. See Mt. Healthy City School District Board of Education v. Doyle, 429 U.S. 274, 283-84, 97 S.Ct. 568, 574, 50 L.Ed.2d 471 (1977); Elrod v. Burns, 427 U.S. 347, 358-60, 96 S.Ct. 2673, 2682-2683, 49 L.Ed.2d 547 (1977); Perry v. Sindermann, 408 U.S. 593, 597-98, 92 S.Ct. 2694, 2697-2698, 33 L.Ed.2d 570 (1972); Pickering v. Board of Education, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1969); Speiser v. Randall, 357 U.S. 513, 518-19, 78 S.Ct. 1332, 1338, 2 L.Ed.2d 1460 (1958). See also Southeastern Promotions, Ltd. v. Conrad, 420 U.S. 546, 554-57, 95 S.Ct. 1239, 1244-1245, 43 L.Ed.2d 448 (1975) (refusal to permit producers of the musical Hair access to municipal theatre was an invalid prior restraint); Healy v. James, 408 U.S. 169, 184, 92 S.Ct. 2338, 2347, 33 L.Ed.2d 266 (1972) (refusal to permit SDS access to state *327 college's facilities "was a form of prior restraint"). Once government provides funds for the exercise of protected rights, it is obligated to respect the norms of the Constitution. It is clear that a refusal to subsidize can constitute forbidden interference with constitutional rights. Therefore, Illinois' refusal to subsidize abortion counseling and referral must be tested to see if it complies with constitutional norms. Illinois has created a program which provides pregnancy counseling and referral as long as no information about abortion is provided. If this program is based on criteria which violate constitutional rights of women, it is invalid.

A
The fourteenth amendment right to have an abortion was initially labeled as a right of privacy. See Roe v. Wade, 410 U.S. 113, 152-54, 93 S.Ct. 705, 726-727, 35 L.Ed.2d 147 (1973). Commentators have pointed out that this is a strained use of the concept of privacy: there is precious little that is "private" about entering a hospital to have a surgical procedure which will terminate a potentially separate life. See, e.g., Ely, The Wages of Crying Wolf: A Comment on Roe v. Wade, 82 Yale L.J. 920, 928-33 (1973); Posner, The Uncertain Protection of Privacy by the Supreme Court, 1979 Sup.Ct.Rev. 173, 197-200. To escape this criticism, the privacy right enunciated in Roe v. Wade must be defined with some precision. What is protected as private is not so much the actual abortion as the process of deciding whether or not to abort. It is this intimate and often agonizing decision which Roe v. Wade recognized must not be left to majoritarian institutions. See Harris v. McRae, 448 U.S. at 312, 100 S.Ct. at 2685 (Wade protects the woman from "unduly burdensome interference with her freedom to decide whether to terminate her pregnancy"); Whalen v. Roe, 429 U.S. 589, 599-600, 97 S.Ct. 869, 876, 51 L.Ed.2d 64 (1977) (recognizing the constitutionally protected interest in "making certain kinds of important decisions" free from governmental interference); Eisenstadt v. Baird, 405 U.S. 438, 453, 92 S.Ct. 1029, 1038, 31 L.Ed.2d 349 (1972) ("If the right of privacy means anything, it is the right of the individual, married or single, to be free from unwarranted governmental intrusion into matters so fundamentally affecting a person as the decision whether to bear or beget a child." (emphasis in original)). The Court has written,
The decision whether or not to beget or bear a child is at the very heart of this cluster of constitutionally protected choices. That decision holds a particularly important place in the history of the right of privacy.... This is understandable, for in a field that by definition concerns the most intimate of human activities and relationships, decisions whether to accomplish or prevent conception are among the most private and sensitive. Carey v. Population Services International, 431 U.S. 678, 685, 97 S.Ct. 2010, 2016, 52 L.Ed.2d 675 (1977).
It is the decisional process which is protected from state interference. This intimate and highly personal decision cannot be left to legislative majorities. The woman herself must be left free to make this decision free from governmental interference.
We hold that § 4604 crosses the line between a passive refusal to subsidize and active interference with the protected decision whether to bear or beget a child. Because the state attempts to control the actual decisional process, by limiting the type of information the woman may receive, it actively interferes with this protected decision. This type of state interference offends the guarantees of the first and fourteenth amendments, and must be invalidated.

B
Section 4604 contains a statutory prohibition on abortion counseling. The statute represents an affirmative state action ensuring that pregnant women will not receive information concerning their abortion option from state grantees.
Of course, it is essential that the constitutional guarantee surrounding this "begetting *328 and bearing choice" be a meaningful one. The right to make this critical decision would mean little unless the decision can be made in an informed manner. Therefore, it is essential that the woman be fully informed so that her decision is an intelligent one. See H.L. v. Matheson, 450 U.S. 398, 101 S.Ct. 1164, 1171-72, 67 L.Ed.2d 388 (1981); Bellotti v. Baird, 443 U.S. 622, 640-41, 99 S.Ct. 3035, 3046-3047, 61 L.Ed.2d 797 (1979) (opinion of Powell, J.); Planned Parenthood v. Danforth, 428 U.S. 52, 67, 96 S.Ct. 2831, 2840, 49 L.Ed.2d 788 (1976); Hodgson v. Lawson, 542 F.2d 1350, 1356 (8th Cir. 1976); Wolfe v. Schroering, 541 F.2d 523, 526 (6th Cir. 1976); Planned Parenthood v. Bellotti, 499 F.Supp. 215 (D.Mass.1980). The necessity for full information is clear. "The decision to abort, indeed, is an important, and often stressful one, and it is desirable and imperative that it be made with full knowledge of its nature and consequences." Planned Parenthood v. Danforth, 428 U.S. at 67, 96 S.Ct. at 2840. In order to obtain such information, the woman must be able to fully consult medical personnel to obtain the necessary information. Friendship Medical Center, Ltd. v. Chicago Board of Health, 505 F.2d 1141, 1147 (7th Cir. 1974), cert. denied, 420 U.S. 997, 95 S.Ct. 1438, 43 L.Ed.2d 680 (1975). The Court has canvassed the factors which require consultation to protect the pregnant woman's rights:
The right of privacy, whether it be founded in the Fourteenth Amendment's conception of personal liberty and restrictions on state action, as we feel it is, or, as the District Court determined, in the Ninth Amendment's reservation of rights to the people, is broad enough to encompass a woman's decision to terminate her pregnancy. The detriment that the State would impose upon the pregnant woman by denying this choice altogether is apparent. Specific and direct harm medically diagnosable even in early pregnancy may be involved. Maternity, or additional offspring, may force upon the woman a distressful life and future. Psychological harm may be imminent. Mental and physical health may be taxed by child care. There is also the distress, for all concerned, associated with the unwanted child, and there is the problem of bringing a child into a family already unable, psychologically and otherwise, to care for it. In other cases, as in this one, the additional difficulties and continuing stigma of unwed motherhood may be involved. All these are factors the woman and her responsible physician necessarily will consider in consultation. Roe v. Wade, 410 U.S. 113, 153, 93 S.Ct. 705, 726, 35 L.Ed.2d 147 (1973) (emphasis supplied).
The pregnant woman thus has a "right to receive medical care in accordance with her licensed physician's best judgment...." Doe v. Bolton, 410 U.S. 179, 197, 93 S.Ct. 739, 750, 35 L.Ed.2d 201 (1973).[7]
The freedom of both doctor and patient when participating in the counseling process is constitutionally protected from state interference. The Court has "underscored the importance of affording the physician adequate discretion in the exercise of his medical judgment." Colautti v. Franklin, 439 U.S. 379, 389, 99 S.Ct. 675, 682, 58 L.Ed.2d 596 (1979); see generally id. at 388, 99 S.Ct. at 681 (doctor must be left free to make an independent judgment as to viability of the fetus free from governmental direction); Planned Parenthood v. Danforth, 428 U.S. at 64, 96 S.Ct. at 2838 (same). The state is prohibited from placing a straightjacket on what may be said and done in the course of this protected counseling relationship. See id. at 67 n.8, 96 S.Ct. at 2840; Charles v. Carey, 627 F.2d 772, 783-84 (7th Cir. 1980); Freiman v. Ashcroft, 584 F.2d 247, 251-52 (8th Cir. *329 1978), aff'd, 440 U.S. 941, 99 S.Ct. 1416, 59 L.Ed.2d 630 (1979); Leigh v. Olson, 497 F.Supp. 1340, 1344-47 (D.N.D.1980); Margaret S. v. Edwards, 488 F.Supp. 181, 207-09 (E.D.La.1980); see also Womens Services, P.C. v. Thone, 483 F.Supp. 1022, 1045-49 (D.Neb.1979), Note, Abortion Regulation: The Circumspection of State Intervention by the Doctrine of Informed Consent, 15 Ga.L.Rev. 681 (1981).
In sum, the right to a full and meaningful opportunity to consult with experts, so as to intelligently make the protected bearing choice, is essential if the woman's rights under Roe v. Wade and its progeny are to be protected. Section 4604-100 is the sort of forbidden legal straightjacket on the protected consulting relationship which fatally undermines the ability of a woman to exercise the decisional right protected in Wade. By means of this statute, the state ensures that a woman will not be told of the complete range of options and relevant considerations to her decision. Thus, the state has created a program which guarantees that women will not be able to make their bearing choice with the kind of full information which the Danforth Court held was imperative. With this statute, the state employs the force of law to require counselors to provide only an incomplete and misleading set of information to pregnant women. Here, the state has gone further than merely encouraging childbirth. It directly intrudes on the counseling relationship, and statutorily prohibits full and complete pregnancy options counseling. "There is a basic difference between direct state interference with a protected activity and state encouragement of an alternative activity consonant with legislative policy." Maher, 432 U.S. at 475, 97 S.Ct. at 2383 (footnote omitted). The state may decline to subsidize abortions, but it may not narrow the ability of women to make their own, private decisions to abort. See McRae, 448 U.S. at 316, 100 S.Ct. at 2687. By creating this statutory prohibition, the state has created a legal obstacle to the protected bearing choice which did not previously exist. By preventing women from receiving complete information, it has undermined the essence of Roe v. Wade: the ability to make the bearing choice in an informed and intelligent manner with the help of experts.[8] The state has used the force of law to infringe constitutionally protected "intimate medical needs." United States v. 12 200-ft. Reels of Super 8mm. Film, 413 U.S. 123, 127 n.4, 93 S.Ct. 2665, 2668, 37 L.Ed.2d 500 (1973). The state may seek to encourage women to make a voluntary and intelligent decision not to terminate their pregnancy, but it may not seek to encourage women to make this decision in ignorance. In Maher and McRae, the state merely declined to subsidize abortion. It did not seek to preclude women from making an independent and knowing bearing choice. Here, the state does seek to impair the intelligence and independence of the woman's choice. That goal is constitutionally impermissible, and the state may not make funding choices on such impermissible bases. See cases cited, pages 326-327 supra.
It is, of course, true that the grantees might on their own decide not to provide complete options counseling even in the absence of § 4604-100. However, such a purely private decision involves no state action, and cannot offend the Constitution. Doe v. Bellin Memorial Hospital, 479 F.2d 756 (7th Cir. 1973). When the state makes this decision, however, constitutional scrutiny is required.[9] Here, the state has attempted *330 to create an unfair and misleading counseling relationship. By creating a statutory prohibition on complete options counseling, the state directly manipulates the protected decisional process. Illinois has done more than merely refuse to subsidize abortions. It has actively required that incomplete and misleading information be required, thereby precluding an informed and intelligent bearing choice by the pregnant woman. This state action cannot survive the scrutiny of the due process clause.

C
The restriction Illinois seeks to place on the ability of pregnant women to obtain information regarding a constitutionally protected choice implicates the first as well as the fourteenth amendment. For it is clear that the first amendment protects the right of "listeners" to receive information. Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc., 425 U.S. 748, 756-57, 96 S.Ct. 1817, 1822-1823, 48 L.Ed.2d 346 (1975); Kleindeanst v. Mandel, 408 U.S. 753, 762-63, 92 S.Ct. 2576, 2581, 33 L.Ed.2d 683 (1972); Griswold v. Connecticut, 381 U.S. 479, 482, 85 S.Ct. 1678, 1680, 14 L.Ed.2d 510 (1965); see Central Hudson Gas & Electric Corp. v. Public Service Commission, 447 U.S. 557, 561-62, 100 S.Ct. 2343, 2348-2349, 65 L.Ed.2d 341 (1980); First National Bank of Boston v. Bellotti, 435 U.S. 765, 776-83, 98 S.Ct. 1407, 1415-1419, 55 L.Ed.2d 707 (1978); Emerson, First Amendment Doctrine and the Burger Court, 68 Calif.L.Rev. 422, 464-65 (1980). It is equally clear that information about abortion is protected by this right to receive information. See Bigelow v. Virginia, 421 U.S. 809, 821-22, 95 S.Ct. 2222, 2232, 44 L.Ed.2d 600 (1975); Planned Parenthood v. Fitzpatrick, 401 F.Supp. 554, 577-78 (E.D. Pa.1975) (three-judge court), aff'd, 428 U.S. 901, 96 S.Ct. 3202, 49 L.Ed.2d 1205 (1976).
Here, the State of Illinois has created an avenue for the communication of constitutionally protected information, however it has distinguished between the types of protected information by permitting grantees to provide information about childbirth but not abortion. When government opens avenues for expression but permits only certain types of speech to utilize the avenues, the equal protection clause as well as the first amendment demand that the classification be scrutinized. See Carey v. Brown, 447 U.S. 455, 461-62, 100 S.Ct. 2286, 2290, 65 L.Ed.2d 263 (1980); Erznoznik v. City of Jacksonville, 422 U.S. 205, 215, 95 S.Ct. 2268, 2275, 45 L.Ed.2d 125 (1975); Police Department v. Mosley, 408 U.S. 92, 95-96, 92 S.Ct. 2286, 2289-2290, 33 L.Ed.2d 212 (1972); Cox v. Louisiana, 379 U.S. 536, 581, 85 S.Ct. 453, 470, 13 L.Ed.2d 471 (1965) (Black, J. concurring and dissenting); Kalven, The Concept of the Public Forum: Cox v. Louisiana, 1965 Sup.Ct.Rev. 1, 29.
Moreover, the distinction that Illinois has drawn in § 4604-100 is content-based. "On its face, the Act accords preferential treatment to the expression of views on one particular subject; information on [that subject] may be freely disseminated, but discussion of all other issues is restricted. The permissibility of communication under the Illinois statute is thus solely dependent on the nature of the message conveyed." Carey v. Brown, 447 U.S. 455, 461, 100 S.Ct. 2286, 2290, 65 L.Ed.2d 263 (1980) (footnote omitted).
Such a content-based distinction requires the strictest scrutiny. "[A]bove all else the First Amendment means that government has no power to restrict expression *331 because of its message, its ideas, its subject matter, or its content." Police Department v. Mosley, 408 U.S. 92, 95, 92 S.Ct. 2286, 2289, 33 L.Ed.2d 212 (1972). See Consolidated Edison Co. of New York, Inc. v. Public Service Commission, 447 U.S. 530, 536, 100 S.Ct. 2326, 2332, 65 L.Ed.2d 319 (1980). A higher standard of review is required when government makes distinctions on the basis of the content of speech. See, e.g., id.; First National Bank of Boston v. Bellotti, 435 U.S. 765, 784-86, 98 S.Ct. 1407, 1420-1421, 55 L.Ed.2d 707 (1978); Perry Local Educators' Association v. Hohlt, 652 F.2d 1286, 1293-94 (7th Cir. 1981); L. Tribe, American Constitutional Law § 12-3 (1978).
For such a content-based distinction to be sustained, it must be finely tailored to serve substantial state interests, and the justification for the distinction must be carefully scrutinized. Carey v. Brown, 447 U.S. at 461-62, 100 S.Ct. at 2290; Hohlt, 652 F.2d at 1294. The test that such a distinction must pass was enunciated by the Supreme Court:
[A] government regulation is sufficiently justified if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the government interest is unrelated to the suppression of free speech; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest. United States v. O'Brien, 391 U.S. 367, 377, 88 S.Ct. 1673, 1679, 20 L.Ed.2d 672 (1968).
The fatal flaw in the Illinois statute is that the governmental interest at stake here is not unrelated to the suppression of free speech. Here, Illinois is not simply refusing to subsidize abortion-related services. It instead goes further and discriminatorily treats free speech concerning abortion. By doing so, it seeks to prevent pregnant women from receiving information about abortions. That government may not do. The first amendment "prohibit[s] government from limiting the stock of information from which members of the public may draw." First National Bank of Boston v. Bellotti, 435 U.S. 765, 783, 98 S.Ct. 1407, 1419, 55 L.Ed.2d 707 (1978). The state may not seek to limit the flow of information about abortion. Bigelow v. Virginia, 421 U.S. 809, 827-29, 95 S.Ct. 2222, 2235-2236, 44 L.Ed.2d 600 (1975); Charles v. Carey, 627 F.2d 772, 782-84 (7th Cir. 1980). Moreover, a state may not seek to favor one type of speech over another. Carey v. Brown, 447 U.S. at 462-63, 468, 100 S.Ct. at 2290-2291, 2294. See A. Meiklejohn, Free Speech and its Relation to Self-Government 11 (1948); Karst, Equality as a Central Principle in the First Amendment, 43 U.Chi.L.Rev. 20 (1975). Here, government seeks to provide preferential treatment to speech concerning childbirth. Such a preference is itself illegitimate. Such a preference violates government's constitutional duty to treat all ideas with equality. The fact that this preference takes the form of a governmental subsidy is irrelevant; since the preference itself is illegitimate. Time and time again, the Court has held that a refusal to offer governmental benefits because of the first amendment activity of the grantee is unconstitutional. See, e.g., Perry v. Sindermann, 408 U.S. 593, 597-98, 92 S.Ct. 2694, 2697-2698, 33 L.Ed.2d 570 (1972). This is because a discriminatory refusal to subsidize protected speech constitutes censorship forbidden by the first amendment:
Censorship, broadly defined as an attempt by the government to suppress the expression of disfavored points of view by private individuals, is a relative concept; it is defined by reference to the opportunities for expression open to favored or neutral viewpoints.... [I]t may easily take the form of amplifying favored or neutral speech, rather than that of stifling the disfavored. Hohlt, 652 F.2d at 1293-94 (footnote omitted).
The fact that the Illinois statute constitutes discrimination against a disfavored viewpoint means that the interest it serves is constitutionally impermissible. However, there is more than simple discrimination here. The statute operates to deny pregnant women the opportunity to receive information *332 necessary to make an informed decision as to their constitutional rights. It is based on a perceived state interest in not disseminating information concerning abortion. However, that interest is also impermissible, entirely apart from the invidious discrimination it works. This much was established by the Court in the Virginia Pharmacy case, where it invalidated the defendant Board's prohibition on advertising of prescription drug prices. What the court said about Virginia's interest in that case also applies to the interest Illinois asserts here:
The challenge now made, however, is based on the First Amendment. This casts the Board's justifications in a different light, for on close inspection it is seen that the State's protectiveness of its citizens rests in large measure on the advantages of their being kept in ignorance. The advertising ban does not directly affect professional standards one way or another. It affects them only through the reactions it is assumed people will have to the free flow of drug price information.
* * * * * *
There is, of course, an alternative to this highly paternalistic approach. That alternative is to assume that this information is not in itself harmful, that people will perceive their own best interests if only they are well enough informed, and that the best means to that end is to open the channels of communication rather than to close them .... It is precisely this kind of choice, between the dangers of suppressing information, and the dangers of its misuse if it is freely available, that the First Amendment makes for us. Virginia State Board of Pharmacy v. Virginia Citizens' Consumer Council, 425 U.S. 748, 769-70, 96 S.Ct. 1817, 1829, 48 L.Ed.2d 346 (1975).
Here too, the state seeks to discourage abortions, something it concededly may do, by denying women access to information concerning them. The Constitution does permit the state to express a preference for childbirth, but it does not permit the state to attempt to persuade women to decide not to terminate their pregnancies by keeping them in ignorance. "A state surely has no legitimate interest in keeping people ignorant of their constitutional rights or in preventing them from exercising them intelligently. Quite apart from the first amendment itself, the very existence of a constitutional right seems to imply the right to exercise that right knowledgeably." Farber, Commercial Speech and First Amendment Theory, 74 Nw.U.L.Rev. 372, 378 (1979) (footnote omitted). Denying pregnant women access to information concerning abortion attempts to promote childbirth by attempting to prevent women from making their protected bearing choice intelligently. The Constitution does not permit that sort of state action.
Thus, the Illinois statute contains a forbidden preference for one type of speech over others, and it attempts to deny women the knowledge essential if they are to exercise their rights intelligently. Suppression of protected communication is at the core of this statute. As a result, it fails the O'Brien test, and must fall. While it is certainly true that Illinois may express a preference for childbirth over abortion, see Parts II and III, supra, it may not do this by discriminating against or suppressing speech about abortion.[10] Government has many legitimate and substantial interests, including the protection of potential life, but it may not pursue those interests by discriminating or suppressing speech which opposes those interests. See Consolidated Edison Co. of New York, Inc. v. Public Service Commission, 447 U.S. 530, 540, 100 S.Ct. 2326, 2334, 65 L.Ed.2d 319 (1980); Carey *333 v. Brown, 447 U.S. at 464-67, 100 S.Ct. at 2292-2293; Virginia State Board of Pharmacy, 425 U.S. at 770, 96 S.Ct. at 1829.[11] "For even the most legitimate goal may not be advanced in a constitutionally impermissible manner." Carey v. Brown, 447 U.S. at 464-65, 100 S.Ct. at 2292.

VI
Section 4604 is more than a passive refusal to subsidize abortion-related services. It directly interferes with the doctor-patient relationship, and undermines the ability of the pregnant woman to make an informed decision whether to abort. What was said in Leigh v. Olson, 497 F.Supp. 1340 (D.N.D. 1980) of a North Dakota statute which required the doctor to give the pregnant woman certain warnings before performing an abortion is equally true of § 4604:
[T]he state has impermissibly injected itself into the private physician-patient relationship, and thus into the abortion decision process. The state ... substitutes its judgment for the medical judgment of the physician in a manner that is of questionable scientific validity and not always in the best interest of the individual patient. Such intrusion is substantial and direct, and thus unduly burdens the woman's right to decide in consultation with her physician, free from governmental interference, whether or not to terminate her pregnancy. Id. at 1346.
The state may prefer childbirth to abortion, but it may not manipulate the woman's decision to have an abortion, or limit her ability to make that decision knowledgeably. Such state goals are constitutionally impermissible, and may not be the basis of public funding choices. Plaintiff's motion for summary judgment is denied as to Counts I and III, and granted as to Count II. Defendant's motion for summary judgment is granted as to Counts I and III, and denied as to Count II. Ill.Rev.Stat. ch. 111½, § 4604-100 (1979) is declared unconstitutional, and defendant William L. Kempiners, as Director of the Illinois Department of Public Health, be and he hereby is enjoined from enforcing it.

ON MOTION TO STAY INJUNCTION
Defendant, William Kempiners, and intervenor-defendant, Care Center of Springfield, Inc., have moved to stay the injunction of November 23, 1981 restraining Kempiners from enforcing Section 4604-100 of the Illinois Problem Pregnancy Health Services and Care Act pending an appeal to the Court of Appeals for this Circuit. In particular, the defendant and intervenor seek permission for Mr. Kempiners to continue grant payments under the Act to those agencies which have been approved for fiscal 1982. The papers disclose that while a grant is approved in a lump sum, funds are disbursed to the grantee only as the grantee incurs expenses and submits vouchers to the State of Illinois for reimbursement thereof. Thus, Mr. Kempiners will violate the November 23 injunction if he authorizes the future disbursement of state funds to grantee agencies pursuant to the statutory preferences and prohibitions which we have held to be constitutionally invalid.
Having reviewed the documents submitted and bearing in mind that an injunction is an equitable remedy, we have concluded that equitably the injunction should be stayed pending appeal to the following extent:
1. Grantees may be reimbursed for all funds which they expended prior to November 23, 1981, and
2. Grantees may be reimbursed for expenditures which they incur to provide future *334 services to women who were pregnant and already receiving services from the grantees as of December 7, 1981.
Paragraph 1 accommodates grantee agencies which have detrimentally relied upon the grant they have been awarded pursuant to the Act which, through no fault of theirs, contains constitutionally impermissible provisions.
Paragraph 2 accommodates women who were pregnant and receiving services from grantee agencies as of the date of our decision on the merits as extended to this date. They could be irreparably injured if their opportunity to counseling was now terminated, for they may have nowhere else to turn. Denial of the stay as to those situations would harm those women without advancing the constitutional interest at stake. This exemption should bear the same cutoff as No. 1, i.e., November 23, 1981, but we choose in the exercise of our equitable discretion to cover the hiatus between that date and the date this order is entered by extending the exemption to December 7, 1981.
The stay in all other respects should be denied. Grantees should not be reimbursed for advice and counseling and services given new clients pursuant to a constitutionally invalid program.
NOTES
[1] When vetoing the Act, the Governor expressed his view that the provisions under challenge in this case were "constitutionally suspect."
[2] We fail to understand Planned Parenthood's argument that it is not asking the state to fund its abortion counseling service. Its application clearly indicates that it intended to use the grant money it would receive for services which include abortion counseling. While Planned Parenthood argues that it would only use private funds for this portion of its program, the application belies that fact. Moreover, the program it proposed appears to be an integrated whole. It is doubtful that the funding for abortion counseling can truly be considered in isolation from the funding for the program as a whole.
[3] Defendants do not dispute that Planned Parenthood also satisfies the nonconstitutional requirements for standing to assert the rights of their clients. Since these requirements are not jurisdictional, the court need not raise them on its own motion. See Craig v. Boren, 429 U.S. 190, 193-94, 97 S.Ct. 451, 454-455, 50 L.Ed.2d 397 (1977); Garvey, A Litigation Primer for Standing Dismissals, 55 N.Y.U.L.Rev. 545, 562-73 (1980). In any event, since Planned Parenthood has suffered injury in fact and has an intimate counseling relationship with its clients, it has standing to assert its clients' rights. Friendship Medical Center, Ltd. v. Chicago Board of Health, 505 F.2d 1141, 1145-58 (7th Cir. 1974), cert. denied, 420 U.S. 997, 95 S.Ct. 1438, 43 L.Ed.2d 680 (1975); see Bigelow v. Virginia, 421 U.S. 809, 815-27, 95 S.Ct. 2222, 2229-2235, 44 L.Ed.2d 600 (1975); Eisenstadt v. Baird, 405 U.S. 438, 443-46, 92 S.Ct. 1029, 1033-1034, 31 L.Ed.2d 349 (1972); Griswold v. Connecticut, 381 U.S. 479, 481, 85 S.Ct. 1678, 1679, 14 L.Ed.2d 510 (1965); Charles v. Carey, 627 F.2d 772, 779 n.10 (7th Cir. 1980). Moreover, Planned Parenthood may not even need jus tertii standing. It may assert its own rights to consult and treat its clients, which the Constitution independently protects. See Harris v. McRae, 448 U.S. 297, 318 n.21, 100 S.Ct. 2671, 2689, 65 L.Ed.2d 784 (1980); Doe v. Bolton, 410 U.S. 179, 197, 93 S.Ct. 739, 750, 35 L.Ed.2d 201 (1973).
[4] "Of course, a law is not considered an interference with the pregnancy termination decision and subject to strict scrutiny merely because it concerns abortion." Charles v. Carey, 627 F.2d 772, 776 (7th Cir. 1980).
[5] We decline to follow Valley Family Planning v. State, 489 F.Supp. 238 (D.N.D.1980), cited by plaintiffs. We doubt that its analysis survives Harris v. McRae. On appeal, in Valley Family Planning v. State, 661 F.2d 99 (8th Cir. 1981), the court of appeals held unconstitutional under the supremacy clause a North Dakota statute which prohibited family planning agencies from receiving either state or federal funds if they performed abortion counseling or referral. The court found the statute incompatible with Title X of the Public Health Service Act, 42 U.S.C. §§ 300-300a-7 (1976), which required, in some instances, that recipients of federal funds provide abortion counseling or referral services. The critical difference between the North Dakota and Illinois statutes is that the latter, unlike the former, disqualifies family planning agencies only from state funds if they provide abortion counseling or referral services. Thus, as plaintiffs have conceded in a supplemental memorandum filed October 20, 1981, the Illinois statute is not invalid under the supremacy clause.
[6] In each of these cases, the Court invalidated refusals to subsidize even though they left persons no less able to exercise rights than if government had taken no action at all. The Court held, in these cases, that refusals to subsidize, when made on impermissible bases, are unconstitutional "burdens" on rights.
[7] It is true that most of the cases concerning the consulting relationship deal with "licensed physicians." However, defendants do not dispute that the services Planned Parenthood provides are functionally identical to those protected by the courts in these cases. To hold that pregnancy options counseling can only be conducted by a licensed physician would not only be medically unnecessary and inefficient, but also would constitute exactly the sort of "straightjacket" on the decisional process which the Constitution prohibits.
[8] "The Supreme Court's decisions in Roe v. Wade and Doe v. Bolton were premised on the concept that a decision to abort would be made in the traditional doctor-patient setting. There was not to be abortion on demand; rather, the abortion decision was to be made only after the doctor and patient had carefully reviewed the physical, emotional, psychological and familial factors relevant to the extremely important and stressful decision." Hodgson v. Lawson, 542 F.2d 1350, 1359 (8th Cir. 1976) (Heaney, J., dissenting).
[9] No showing has been made that § 4604-100 has in fact any actual effect on the ability of pregnant women to obtain complete options counseling. However, none is required. Here, the state action in question has an impermissible purpose: to attempt to ensure that women will not receive complete options counseling. Such interference with a protected activity alone violates the Constitution, without any showing of effect. See Memorial Hospital v. Maricopa County, 415 U.S. 250, 258, 94 S.Ct. 1076, 1082, 39 L.Ed.2d 306 (1974); Dunn v. Blumstein, 405 U.S. 330, 338-40, 92 S.Ct. 995, 1001-1002, 31 L.Ed.2d 274 (1972); Shapiro v. Thompson, 394 U.S. 618, 631-33, 89 S.Ct. 1322, 1329-1330, 22 L.Ed.2d 600 (1969). The fact that privately funded options counseling may be available is irrelevant. The Constitution prohibits denials of governmental benefits when made on impermissible bases, even when equivalent private benefits are readily available. See Southeastern Promotions, Ltd. v. Conrad, 420 U.S. 546, 556, 95 S.Ct. 1239, 1245, 43 L.Ed.2d 448 (1975).
[10] In this respect, it is instructive to note the difference between § 4604-100 and its federal counterpart, 42 U.S.C. § 300a-6 (1976). The federal statute, as administered by the Department of Health and Human Services, prohibits federal grants to agencies which perform abortions, but allows grants to agencies which provide information about abortions in a neutral manner. See Valley Family Planning v. State, 489 F.Supp. 238, 241-42 (D.N.D.1980), aff'd, 661 F.2d 99 (8th Cir. 1981).
[11] Cf. Central Hudson Gas & Electric Corp. v. Public Service Commission, 447 U.S. 557, 571-72, 100 S.Ct. 2343, 2354, 65 L.Ed.2d 341 (1980) ("Our decision today in no way disparages the national interest in energy conservation. We accept without reservation the argument that conservation, as well as the development of alternative energy sources, is an imperative national goal. Administrative bodies empowered to regulate electric utilities have the authority and indeed the dutyto take appropriate action to further this goal. When, however, such action involves the suppression of speech, the First and Fourteenth Amendments require that the restriction be no more than is necessary to serve the state interest.").